# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ROANOKE DIVISION

| | |
|---|---|
| JOYCE A. PHELPS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 7:09cv0210 |
| v. ) | |
| ) | |
| MICHAEL J. ASTRUE, ) | By:  Michael F. Urbanski |
| Commissioner of Social Security, ) | United States Magistrate Judge |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

Plaintiff Joyce A. Phelps ("Phelps") brought this action for review of the Commissioner of Social Security's ("Commissioner") decision denying her claim for disability insurance benefits under the Social Security Act (the "Act"). Phelps seeks an award of disability benefits based on impairments related to her degenerative disc disease, back and leg pain dating from December 29, 2006. In this appeal, Phelps claims that the Commissioner erred by not according controlling weight to the opinion of her treating family physician, Dr. David O. Cummings, and instead relying on other evidence in the record from other treating sources, including a neurosurgeon and physical therapist, as well as reviewing state agency physicians. Phelps also claims that the ALJ failed to appropriately consider her obesity under Social Security Regulation 02-01p. Review of the administrative record confirms that the Commissioner appropriately evaluated all of the medical evidence concerning Phelps' claimed impairments and reached a decision that is amply supported by substantial evidence. In particular, Phelps' treating neurosurgeon saw no medical reason why Phelps could not work; her claims of pain were not supported by objective clinical findings or testing; and her treating physical therapist discharged

Phelps from treatment, stating that her positive Waddell's Test indicated that her "pain was possibly caused by a non-organic, psychological, or social element." (Administrative Record, hereinafter "R." at 207.) Further, a consulting examining physician found that Phelps retained the residual functional capacity to perform some work. The ALJ found Phelps' obesity to be a severe impairment, but no medical evidence in the record suggests it was functionally limiting. As such, the Commissioner's decision must be affirmed.

I

Section 405(g) of Title 42 of the United States Code authorizes judicial review of the Commissioner's denial of social security benefits. Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "'Under the Social Security Act, [a reviewing court] must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct, legal standard.'" Id. (alteration in original) (quoting Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996)). "Although we review the [Commissioner's] factual findings only to establish that they are supported by substantial evidence, we also must assure that [his] ultimate conclusions are legally correct." Myers v. Califano, 611 F.2d 980, 982 (4th Cir. 1980).

The court may neither undertake a de novo review of the Commissioner's decision nor re-weigh the evidence of record. Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992). Judicial review of disability cases is limited to determining whether substantial evidence supports the Commissioner's conclusion that the plaintiff failed to satisfy the Act's entitlement conditions. See Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966). Evidence is substantial when, considering the record as a whole, it might be deemed adequate to support a conclusion by a reasonable mind, Richardson v. Perales, 402 U.S. 389, 401 (1971), or when it would be sufficient to refuse a directed verdict in a jury trial. Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996).

Substantial evidence is not a "large or considerable amount of evidence," Pierce v. Underwood, 487 U.S. 552, 565 (1988), but is more than a mere scintilla and somewhat less than a preponderance. Perales, 402 U.S. at 401. If the Commissioner's decision is supported by substantial evidence, it must be affirmed. 42 U.S.C. § 405(g); Perales, 402 U.S. at 401.

"Disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The "[d]etermination of eligibility for social security benefits involves a five-step inquiry." Walls v. Barnhart, 296 F.3d 287, 290 (4th Cir. 2002). This inquiry asks whether the claimant (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his or her past relevant work; and if not, (5) whether he or she can perform other work. Heckler v. Campbell, 461 U.S. 458, 460-462 (1983); Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (citing 20 C.F.R. § 404.1520). If the Commissioner conclusively finds the claimant "disabled" or "not disabled" at any point in the five-step process, he does not proceed to the next step. 20 C.F.R. § 404.1520(a)(4). Once the claimant has established a prima facie case for disability, the burden then shifts to the Commissioner to establish that the claimant maintains the residual functional capacity ("RFC"),[1] considering the claimant's age, education, work

---

[1] RFC is a measurement of the most a claimant can do despite his limitations. See 20 C.F.R. § 404.1545(a). According to the Social Security Administration:

> RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule.

Social Security Regulation (SSR) 96-8p. RFC is to be determined by the ALJ only after he considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain). See 20 C.F.R. § 404.1529(a).

experience, and impairments, to perform alternative work that exists in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

## II

On the claimed disability onset date, Phelps was 49 years old. Phelps graduated from high school and took two years of college courses without obtaining a degree. (R. 26.) Phelps later obtained a certified nursing assistant certification. Phelps worked for ten years as a private duty nursing assistant, and thereafter in production and retail. She last worked in 2006 dealing with returns for a mail order firm. (R. 26-27, 123, 129.) Phelps testified that she left that job because she began having back problems. (R. 27.) Phelps claims disability as of December 29, 2006. Her application for benefits was rejected by the Commissioner initially and again upon reconsideration. An administrative hearing was convened before an ALJ on January 14, 2009. (R. 23.) In determining whether Phelps was disabled under the Act, the ALJ found that she had the following severe impairments: obesity, osteoarthritis/degenerative joint disease of the bilateral knees, shoulders, and lumbrosacral spine. (R. 10.) Nevertheless, the ALJ concluded that these impairments were not totally disabling, and that Phelps retained the RFC to perform a range of light work. (R.15-18.) The ALJ found Phelps could not return to her past relevant work, but concluded at step five that there were a significant number of jobs in the national economy that a person with her impairments could perform, and thus she was not disabled. (R. 19-20.)

Phelps sought review by the Appeals Council, which denied her request for review on April 29, 2009. This appeal was filed in federal court on May 28, 2009. The parties filed cross motions for summary judgment motion, and oral argument on the motions was held on April 20, 2010.

**III**

Phelps argues that the ALJ erred by failing to employ the proper standard in her evaluation of the opinions of claimant's treating physician, Dr. Cummings. Plaintiff correctly notes that the treating physician's medical opinions are entitled to great deference. See Hines v. Barnhart, 453 F.3d 559, 563 (4th Cir. 2006) (explaining that courts typically "accord greater weight to the testimony of a treating physician because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant"); 20 C.F.R. § 404.1527(d)(2) ("Generally, we give more weight to opinions from your treating sources"). In fact, in certain circumstances, the opinion of a treating physician is entitled to controlling weight. 20 C.F.R. § 404.1527(d)(2) ("If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight."). But the opinion of a treating source is not always entitled to great deference or greater weight. Instead, the regulations explain that when opinion is not given controlling weight, the ALJ will "apply the factors listed [below]…in determining the weight to give the opinion." Id. One of those factors is the length of the treatment relationship. See 20 C.F.R. § 404.1527(d)(2)(i). Other relevant factors are the supportability of the opinion, as determined by the evidence presented by the medical source, and consistency of the opinion with the record as a whole. See 20 C.F.R. § 404.1527(d)(3), (4). For example, contradictory persuasive evidence can discredit a treating physician's opinion. See Foster v. Heckler, 780 F.2d 1125, 1130 (4th Cir. 1986) ("A treating physician's testimony is ignored *only* if there is persuasive contradictory evidence.") (emphasis in original). Finally, a treating physician's opinion is not given any special deference when the opinion relates to the claimant's ability to work or her RFC. See 20 C.F.R. § 404.1527(e)(2) ("Although we consider

5

opinions from medical sources on issues such as. . . your residual functional capacity. . . the final responsibility for deciding these issues is reserved to the Commissioner.").

In this case, the ALJ determined that an RFC assessment completed by Dr. Cummings was "not supported by objective evidence of record. Furthermore, Dr. Cummings is not a specialist, but rather has a practice in family medicine, and he seems to rely far too heavily upon the claimant's subjective complaints. Therefore, the opinion of Dr. Cummings is accorded slight weight." (R. 17.)

The administrative record contains medical records of Phelps's treatment with Dr. Cummings at Southwest Medical Clinic between August 16, 2006 and January 6, 2009. At her first visit on August 16, 2006, Dr. Cummings discussed with Phelps an x-ray of her lumbar spine noting degenerative changes at L5-S1 with disc space narrowing. Cummings suspected lumbar radiculopathy, and Phelps requested conservative treatment. Phelps was instructed to continue use of a tens unit for her chronic back pain and to come in for a recheck for any worsening of symptoms or concern in medical progress. (R. 265.) Phelps was seen by Dr. Cummings on October 11, 2006 and November 30, 2006, but she made no complaint about her back. On December 28, 2006, Phelps saw Dr. Cummings for a cold and also complained of problems with lifting and bending. Dr. Cummings imposed a 10 pound lifting restriction and ordered a lumbar MRI. (R. 264.) The MRI, performed on January 2, 2007, revealed mild broad-based disk bulge at L3-4, and broad-based disk bulge at L4-5 and L5-S1. (R. 243.) Dr. Cummings then referred Cummings to Dr. John A. Feldenzer, a neurosurgeon, for consultation. ( R. 240.)[1]

---

[1] Phelps had been seen earlier by Dr. Brian Torre, an orthopedic surgeon, on a few occasions in late 2005 and early 2006. On December 12, 2005, Dr. Torre wrote that Phelps was having some discomfort after standing a long period of time at work and that she was to be limited to working only 8 hour days "because over that her leg starts to hurt." (R. 198.) Dr. Torre injected her right knee on February 15, 2006. On May 15, 2006, Dr. Torre examined Phelps for a complaint of discomfort running from her back down her legs at times. His examination revealed "[g]ood range of motion of the spine with minimal pain on extension and lateral flexion," noted that she was intact neurologically, had negative straight leg raising and good range of motion in the knee and hips. (R. 196.)

Dr. Feldenzer saw Phelps on January 15, 2007 for evaluation of her back pain. Dr. Feldenzer reviewed the January 2, 2007 MRI and noted that it "shows mild degenerative change at the three lowest lumbar discs. There is very slight disc bulging but no focal protrusion and no significant mass affect on the dural sac or exiting nerve root at any of these levels. I do believe that this study has been 'over read' by the radiologist particularly at the lowest two levels. There may be a small synovial cyst seen on the left at L4-5." (R. 204.) Dr. Feldenzer's assessment was of chronic lumbar syndrome related to underlying lumbar spondylosis. (R. 204.) He continued as follows:

> She does not have an active radiculopathy and does not require any operative intervention on her back. I have recommended that she see a physiatrist for ongoing management of her discomfort. Certainly an exercise program and improved physical conditioning will help particularly with her job which involves a significant physical exertion. I really see no medical reason why she cannot work at this time but she wants to defer until she sees Dr. Joiner to whom I have referred her.

(R. 204.)

Phelps was seen in Dr. Murray A. Joiner's Physical Medicine and Rehabilitation office on four occasions between February 5, 2007 and April 25, 2007. The initial examination note, signed by Dr. Randall K. Falls, noted decreased lumbar lordosis, bilateral lumbar paraspinal tenderness, sacroiliac joint and gluteal tenderness. Dr. Falls noted numerous trigger points but no specific increased pain with extension. Dr. Falls performed a sitting straight leg raise test which was negative bilaterally. (R. 237.) Phelps' neurologic exam was normal. (R. 238.) Phelps was given pain and anti-inflammatory medications and enrolled in physical therapy. As to work, Dr. Falls' note states: "Continue current work status, i.e., out of work. The patient reports her employer is unable to accommodate light duty restrictions as her job requires prolonged, heavy bending and lifting. The patient is unable to return to work at this time.

7

Anticipate return to work in 8-12 weeks." (R. 238.) Phelps was seen again by Dr. Joiner on March 14, April 4 and April 25, 2007. She received pain medication injections on the March 14 and April 25 visits. Dr. Joiner described her lumbar degenerative disc disease to be of "unknown clinical significance." (R. 231, 225.)

Phelps was initially seen by a physical therapist on February 8, 2007, and was recommended to undergo physical therapy 2-3 times a week for 4-6 weeks. (R. 213.) However, Phelps reported feeling worse after therapy sessions and was discharged from physical therapy on March 8, 2007, the therapist reporting that "[o]verall, the patient has not met any goals nor made any progress toward the goals." (R. 207.) The discharge report continued as follows:

> The positive tests for Waddell's included (+) tenderness superficially and nonanatomic, (+) simulation with axial loading and rotation, (+) distraction with the patient not complaining of pain when she is in sitting and legs are extended, (+) regional disturbances – patient report of entire leg hurting on both legs. The positive 4/5 Waddell's Tests indicating that her pain is possibly caused by a nonorganic, psychological, or social element. At this point, I feel this patient is not appropriate for physical therapy. She has not made any progress, and actually states that she is getting worse over the last 4 weeks. Recommend that this patient should be discharged from physical therapy.

(R. 207.) [2]

On December 10, 2007, Dr. Cummings noted "[n]o change chronic back pain mild decrease range motion lumbar spine." (R. 267.) In April, 2008, Dr. Cummings discussed

---

[2] The court takes judicial notice that the Waddell's Test refers to an article published in <u>Spine</u> in 1980 authored by G. Waddell, J.A. McCulloch, and R.M. Venner. The abstract of the article appearing at PubMed.gov, U.S. National Library of Medicine, National Institutes of Health, states as follows:

> Nonorganic physical signs in low-back pain are described and standardized in 350 North American and British patients. These nonorganic signs are distinguishable from the standard clinical signs of physical pathology and correlate with other psychological data. By helping to separate the physical from the nonorganic they clarify the assessment of purely physical pathologic conditions. It is suggested also that the nonorganic signs can be used as a simple clinical screen to help identify patients who require more detailed psychological assessment.

http://ncbi.nlm.nih.gov/sites/entrez?cmd=search&db=pubmed8.

chronic back pain management with Phelps. (R. 267.) At that time, Dr. Cummings stated that his neurological exam revealed "no lateralizing neuro deficits." (R. 267.) The same was noted in a visit to Dr. Cummings in September, 2008. (R. 267.) On January 6, 2009, Phelps reported to Dr. Cummings that physical therapy was "no help," Dr. Joiner's injections resulted in no improvement, and that the neurosurgeon said her condition was not operable. (R. 274.) Phelps told Dr. Cummings that her back "hurts all the time," and both her legs were numb. (R. 274.) Dr. Cummings noted no change in his neurological exam at that time.

On the date of this last visit, January 6, 2009, Dr. Cummings completed a Medical Source Statement of Ability to do Work-Related Activities (Physical). On this form, Dr. Cummings stated that Phelps could occasionally and frequently lift less than 10 pounds, stand, walk and sit less than 2 hours in an 8 hour workday, and could never climb, balance, kneel, crouch, crawl or stoop. (R. 269-70.) He estimated that Phelps would be absent from work more than three times a month. Dr. Cummings added that "[p]atient has been seen by neurosurgeon and physiatrist with no improvement and maybe some retrogression of symptoms." (R. 272.)

On November 5, 2007, Phelps was examined by Dr. William Humphries of the Virginia Department of Rehabilitative Services. Dr. Humphries noted that the range of motion in Phelp's back was severely reduced. He noted that "[s]he declines to flex forward more that about 5 degrees of the lumbar region in the standing position, however, she is able to sit with the hips flexed at about 90 degrees. There is mild tenderness to palpation of the paraspinous musculature of the lower thoracic and entire lumbar region. There is mild dorsal kyphosis. No scoliosis. No paravertebral muscle spasm. The straight leg raise is negative to 90 degrees sitting bilaterally." (R. 252.) Dr. Humphries noted normal strength in all four extremities and "no specific motor or sensory loss of the lower extremities." (R. 253.) Based on his examination, Dr. Humphries

concluded that Phelps would be limited to sitting and/or standing for 6 hours, walking for 6 hours, and lifting 25 pound occasionally and 10 pound frequently. Dr. Humphries determined that Phelps could stoop or crouch, occasionally climb, but not kneel or crawl. (R. 254.)

Two state agency physicians also assessed Phelp's physical RFC based upon a review of her medical records. On June 25, 2007, Dr. Robert McGuffin performed a Physical Residual Functional Capacity Assessment and concluded that she could lift 50 pounds occasionally, 25 pounds frequently, stand and/or walk for 6 hours and sit for 6 hours. He found Phelps limited in her ability to push and/or pull with her lower extremities and that she could occasionally climb, balance, stoop, kneel, crouch, and crawl. (R. 244-250.) On November 16, 2007, Dr. Frank Johnson agreed with Dr. McGuffin's assessment of Phelps' ability to sit, stand and/or walk and push and/or pull. He disagreed as to her ability to lift, finding her only capable of lifting 20 pounds occasionally and 10 pounds frequently. Dr. Johnson was less restrictive than Dr. McGuffin in Phelps' postural limitations, however, finding that she could frequently stoop and crouch. (R. 256-62.)

The ALJ exhaustively cataloged all of the medical evidence and opinions and concluded that Phelps was capable of performing light work, with limitations in her ability to push and/or pull in her lower extremities and certain postural and environmental limitations. (R. 15.) The ALJ considered Dr. Cummings' Medical Source Statement, but found that it was only entitled to slight weight as it was not supported by objective medical evidence but rather appeared to be reflective of Phelps' subjective complaints. The court agrees. Dr. Cummings' medical records do not support his disability opinion, but are, in fact, largely reflective of what Phelps told Dr. Cummings at her visit on January 6, 2009, the day he completed the Medical Source Statement. In contrast, Dr. Feldenzer, Phelps' treating neurosurgeon, stated that there was no medical reason

why she could not work; Dr. Joiner, Phelps' treating physiatrist, noted that her back pain was of "unknown clinical significance;" and Dr. Torre, an orthopedic surgeon, noted that she should not work over 8 hours a day because after that her leg starts to hurt. In addition to these treating physician views, all three state agency physicians concluded that Phelps retained the capacity to perform some work. Finally, Phelps' physical therapist, Kristin Hudson, wrote Dr. Joiner on March 8, 2007 discharging Phelps from physical therapy and noting that her positive Waddell's Test indicated "that her pain is possibly caused by a nonorganic, psychological, or social element." (R. 207.) Considering all of this evidence, especially the assessments of treating specialists Torre, Joiner and Feldenzer, it is plain that there is substantial evidence to support the ALJ's conclusion that Phelps retains the RFC to perform a limited range of light work and that Dr. Cummings' opinion not be accorded controlling weight.

## IV

Phelps next argues that the ALJ failed to consider her obesity appropriately under Social Security Ruling ("SSR") 02-01p. Phelps contends that she has a Level I Body Mass Index (BMI) under National Institute of Health guidelines, and that the ALJ failed to specifically evaluate her obesity. The Commissioner argues that the ALJ determined Phelp's obesity was a severe impairment and relied on the opinions of Drs. Feldenzer and Humphries, both of whom examined Phelps and noted her height and weight. Dr. Feldenzer's consultation report dated January 15, 2007 stated that her past medical history was "[n]otable for being overweight at nearly 200 lbs at 5'7"." (R. 203.) Likewise, Dr. Humphries documented her weight at 199 pounds but pegged her height at 66.25 inches, or approximately 5'6". (R. 252.)

SSR 02-01p provides guidance on Social Security Administration policy concerning the evaluation of obesity in disability claims. Before 1999, obesity had been a listed impairment, but

11

it was deleted in 1999 based on the Commissioner's experience that the obesity listing did not represent a degree of functional limitation that would prevent an individual from engaging in any gainful activity. SSR 02-01p explains that although the obesity listing was deleted, other changes were made to the listings to ensure that obesity remained considered as a medically determinable impairment and that the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately. SSR 02-01p explains in great detail how obesity is to be considered in determining whether an individual's impairments meet or exceed a listing, and provides that "[w]e will also find that a listing is met if there is an impairment that, in combination with obesity, meets the requirements of a listing." SSR 02-01p. The ruling also explains how the Commissioner evaluates obesity in assessing a claimant's RFC.

Very few of Phelps' medical records mention obesity. Dr. Feldenzer's consultation report of January 15, 2007 is the clearest reference to Phelps being overweight. To be sure, other medical records reflect Phelps' height and weight, but obesity was not otherwise mentioned in the medical records of treating doctors Cummings, Joiner and Torre.

Phelps argues that the ALJ did not consider her obesity, but that argument fails to recognize that the ALJ found Phelps' obesity to be a severe impairment. (R. 10.) Beyond that, there are no medical records that suggest that Phelps had other impairments that, when combined with her obesity, met or equaled a listing. Nor are there any medical records or opinions which suggest that Phelps' obesity caused her any limitation of function. Phelps' medical history simply does not support her contention that her obesity was disabling or caused any limitation of function. The ALJ plainly did not ignore Phelps' obesity as it was considered to be a severe impairment. However, there is simply no evidence in this record to suggest that Phelps obesity

was disabling or had functional consequences requiring the ALJ to engage in a more detailed evaluation of her obesity. Given the paucity of medical evidence regarding the Phelps' obesity, there is no basis for Phelps' contention that the Commissioner failed to follow SSR 02-01p.

V

At the end of the day, it is not the province of the court to make a disability determination. It is the court's role to determine whether the Commissioner's decision is supported by substantial evidence, and, in this case, substantial evidence supports the ALJ's decision. In finding that the final decision of the Commissioner be affirmed, the court does not suggest that Phelps is free from all pain and subjective discomfort. Careful review of the medical records compel the conclusion that Phelps has not met her burden of establishing that she was totally disabled from all forms of substantial gainful employment. The ALJ properly considered all of the subjective and objective factors in adjudicating plaintiff's claim for benefits. It follows that all facets of the Commissioner's decision in this case are supported by substantial evidence.

An appropriate Order dismissing this appeal will be entered.

Entered: September 9, 2010.

*/s/ Michael F. Urbanski*

Michael F. Urbanski
United States Magistrate Judge